**Slimmer v. Steininger**

*John A. Hoffert,* for plaintiff.
*Lisa D. Gentile,* for defendant.

LASH, *J.,* April 17, 2008—This court held a child custody trial on April 14, 2008. The court makes the following findings of fact:

## I. FINDINGS OF FACT

(1) Plaintiff, Jennifer Slimmer (Mother), is an adult individual who currently resides at 742 North Eleventh Street, Reading, Berks County, Pennsylvania.

(2) Defendant, Richard T. Steininger (Father), is an adult individual who currently resides at 2806 Old Pricetown Road, Temple, Berks County, Pennsylvania.

(3) Father and Mother are the natural parents of two minor children, Dakota James Steininger, born March 2, 2000, and Melissa Nicole Slimmer, born July 10, 2003.

(4) Mother currently resides with the minor children, her daughter, Selena Slimmer, born February 6, 1996, and Mother's paternal grandparents, Richard and Marla Slimmer.

(5) Father currently resides with his father, Richard L. Steininger, and a third party described by Father as his father's "godson," Brian K. Kohl.

(6) Mother is currently unemployed.

(7) Father is employed with Temporary Star Staffing, working Monday through Friday from 6 a.m. to 2:30 p.m. and some Saturdays.

(8) The parties were never married but resided together. It appears they separated sometime in February of 2002, later resuming their relationship for a short time, during which time Melissa was conceived.

(9) Mother resides in the Reading School District.

(10) Father resides in the Oley School District.

(11) The minor child, Dakota, attended Muhlenberg School until about two months ago, when he was transferred to Reading School District. He was transferred to the Reading School District because neither parent resided in the Muhlenberg School District.

(12) After the parties' separation, Mother, at some point, moved in with relatives in the Muhlenberg School District. At that time, she enrolled her eldest child, Selena, in the Muhlenberg School District. When Dakota became of school age, Mother and the minor children had already moved into Mother's grandparents' home in the City of Reading. However, Mother had continued to allow Selena to attend Muhlenberg School District and enrolled Dakota there as well, misadvising the Muhlenberg School District that they resided in Muhlenberg Township.

(13) Several custody orders have been entered in this case. The first was entered in September 20, 2002, by agreement, conferring upon Mother primary physical custody of Dakota, with Father to have partial custody every Saturday from 8 a.m. until 6 p.m. That order was amended on October 11, 2002 to add provisions for Father's Day and for Father to have telephone call privileges on Monday, Wednesday and Friday of each week.

(14) On or about August 11, 2005, Father filed a petition to modify custody, ostensibly to add Melissa to the custody order. The petition to modify resulted in an order being entered on November 23, 2005, following a conference before the custody master, setting forth, among other things, that Mother would retain primary physical custody of both minor children with Father to have partial custody of the minor children every weekend from Saturday at 6 p.m. until Sunday at 6 p.m., and every Thursday from 6:30 p.m. until 8 p.m.

(15) Another conference was scheduled resulting in a custody order being entered on July 24, 2006 by agreement of the parties. The order modified Father's time with the minor children such that Father would now have the minor children on alternate weeks from Thursday after Father concluded his work until Sunday at 5 p.m., and on alternate Tuesdays from 4 p.m. until the minor children's bedtime.

(16) The most recent order was entered September 11, 2006, modifying the previous order, with Father now having partial custody on alternate weekends from Thursday after Father concludes work until Sunday at 7 p.m., and every Tuesday from 4 p.m. until 8 p.m. The order also required the parties and Dakota to attend counseling with Dan Smith, a licensed social worker.

(17) On or about May 7, 2007, Father filed a petition to modify the custody order of September 11, 2006. It is this petition to modify which is currently before the court.

(18) The parties were involved in several other court proceedings, including protection from abuse matters and investigations by Children and Youth Services.

(19) The first protection from abuse matter was filed by Mother against Father on April 2, 2001 at docket no. 01-3403, I.D. no. 1. Mother alleged that Father had been physically abusive for about a year. After an argument, he jammed his finger into her eye causing substantial injury. She alleges this altercation occurred in front of Dakota, who Father also "accidently" hit. That petition was resolved on April 9, 2001 by a final order being entered by agreement, setting forth that Father would have no contact with Mother, except for child custody purposes, for a period of 18 months.

(20) On January 27, 2006, Mother filed a second petition at docket no. 01-3403, I.D. no. 2, requesting protection from abuse alleging that Father was stalking and threatening her. On February 3, 2006, the court, again by agreement, entered a final order setting forth that Father would have no contact with Mother, except for child custody purposes. The order was to remain in place for a period of 15 months.

(21) On February 22, 2006, Father was charged with indirect criminal contempt for violating the February 3, 2006 protection from abuse order. After hearing held on March 23, 2006, the Honorable Mary Ann Campbell dismissed the charge of indirect criminal contempt.

(22) On January 10, 2006, Mother filed another protection from abuse petition (docket no. 06-7505, I.D. no. 1), this time on behalf of her three children, alleging that Father had improper, indecent contact with Melissa and

that Dakota had also been touching Melissa. This matter resulted in a Children and Youth Services investigation. On July 31, 2006, the petition was dismissed by this court.

(23) On January 8, 2008, Mother filed a new protection from abuse petition (docket no. 01-3403, I.D. no. 3) alleging an altercation occurring while Mother was sitting in the driver's seat of her vehicle while Father was placing Dakota in the car seat on the right rear passenger seat. In her petition, she states: "He tried to rip the passenger seat out and when he could not do it, he spit at me and our son. He was halfway into the car and I tried to drive off. He climbed into the car and punched me again. I drove off and he jumped out slamming the car door hitting our son's hand injuring two fingers on his right hand." On March 19, 2008, Mother withdrew this petition.

(24) In addition to the Children Services investigation against Father, as already set forth, Mother's home was also investigated by Children and Youth Services. In both cases, Children Services made a finding of "unfounded."

## II. DISCUSSION

The issue is primary physical custody. In making our determination, this court considered the testimony of the parties, in camera conferences with the minor children, testimony from the maternal grandmother, Debra S. Wessner, Mother's paternal grandmother, Marla Slimmer, Mother's other child, Selena Slimmer, two friends of the parties, Mary Ann Gagliardo and Jennifer Boyle, the

counselor, Dan Smith, exhibits submitted by the parties, and the questionnaires, which the court directed the parties to answer and which have been made part of the court file.

Each party's presentation at trial consisted almost exclusively of providing a list with examples of the other party's poor conduct. This court heard that both parties were physically assaultive to the other. Each engaged in name calling and obscenities in front of the minor children. Each party refused to communicate to the other. Each party allowed situations to occur which could be physically unsafe to the minor children. Both parties violated court orders by their own admission. There were substantial credibility problems with both parties.

The parties appear to genuinely dislike each other. Although no psychological profile was presented, there is ample evidence that Mother is controlling and histrionic. Father has a passive/aggressive demeanor, resulting in him acting out. Both accuse the other of substance abuse, in Mother's case alcohol, and in Father's case drugs and alcohol. The hard feelings have extended to other family members, as well. Both parties appear oblivious to the terrible impact their conduct has on the minor children's well-being.

Each party denies the other party's allegations. Each party portrays himself or herself as a good parent and, for the most part, blameless for the protracted hostilities. It is from this unfortunate set of circumstances that we are called upon to discern what is best for these minor children.

Father was the first presenter. His first concern related to the inordinate amount of bruises he observes on the minor children. On one occasion, Mother broke Dakota's right pinky figure during horseplay. On another occasion, Melissa fell off Mother's front porch, splitting her lip open. On another occasion, Mother took the minor children to the swimming pool where they suffered substantial sunburn. The minor children, who were diagnosed early with respiratory ailments, are allegedly exposed to smoking, particularly when in the presence of the maternal grandmother. According to Father, the minor children are also not bathed properly when at Mother's house.

Father believes that Mother is deliberately refusing to communicate with him and restricting access to the minor children by phone. Under the terms of the court order, Father is permitted phone calls with the minor children several times per week. He states that he only has the opportunity for about half of these phone conversations, as Mother refuses to answer the phone. She will not advise him on any activities at school or on issues involving the minor children's medical care. She will not permit Father to sign Dakota up for sports.

He believes Mother and her family engage in calling him names and using obscene language in the presence of the minor children. Melissa, who is currently only 4 years old, has a habit of making an obscene gesture with her middle figure, which Father believes was taught to her by Mother or Mother's grandmother.

Father believes that Mother in September of 2007, while attending a party, became so intoxicated that she

was unable to care for her child. The host family took Mother's car keys and required Mother to sleep at their house. Mother's daughter was taken to a caretaker by a third party.

Father points out that Mother arranged for Dakota to attend the Muhlenberg School District, even though neither party resided in that district. He believes that Mother induced Dakota, as well as Selena, to lie to the Muhlenberg School District officials about where they resided.

When Mother took a vacation period approximately two weeks before Christmas, she denied Father any phone access to the minor children, resulting in Father not having any contact with the minor children for a little over two weeks, immediately before the Christmas holiday.

Father argues that Mother abuses the court system. In one example, he states that immediately after stating to the custody master that Father was "a good father," Mother fabricated allegations regarding abuse of the minor children, resulting in an investigation by Children Services and the commencement of a protection from abuse action.

Father believes he would be more invested in the minor children's day-to-day activities. He would like to have Dakota involved in baseball and soccer, which Father believes Dakota wants to do. Mother, however, has thwarted this. Father also denounces Mother's actions regarding Cub Scouts. While enrolling Dakota in Cub Scouts, she pulled him out of the Cub Scout troop, and did so without telling Father. Father would like the op-

portunity to attend the Cub Scout meetings and participate.

Father believes that if he had custody of the minor children, they would be better cared for, reducing the number of injuries being suffered by the minor children. Unlike Mother, Father would cooperate with Mother in advising her of any medical problems, or school problems, for that matter, so that both parties could participate in a prompt and appropriate resolution.

As stated, Mother makes a similar attack on Father. She points out that he gouged her in the eye with his finger during an altercation, resulting in Mother having substantial problems which continue to this day. She obtained a protection from abuse order against him based on this incident. During another argument, while Mother was seated in the driver's seat of her car and while Father was attempting to place Dakota in his car seat, the parties began arguing again. Mother claims that Father was attempting to hit her, and ultimately got angry when she tried to pull out, slamming the car door on Dakota's finger. On another occasion, he slammed the door on Melissa's finger, when she tried to enter his bedroom while he was loading a gun. On another occasion, Melissa tripped around the fireplace, resulting in her suffering burns to her hand. Father provided only minimal treatment on Melissa's behalf.

Mother states that Father engages in inappropriate discipline. For example, he threatened to "handcuff the children to a pipe in the basement" if they misbehave.

Mother is concerned about Father's brother, Kenneth A. Steininger, who has been convicted of sexually re-

lated offenses. Although the brother is currently incarcerated, Mother argues that Father had permitted him to have contact with the minor children, exercising poor judgment.

Mother states that Father makes no attempt to communicate with her regarding the welfare of the minor children. She has to bear the entire burden of maintenance for the minor children, including overseeing their school work, including making contacts with the school personnel, and insuring that they get proper medical attention.

Mother claims that Father has exhibited racist behavior. He was involved in an argument with an African-American family in front of Mother's residence, ostensibly because he used offensive language. More central to the concerns of this case, Mother alleges that Father has called Selena a "spic," based on her one-half Latino heritage. He also called her a "pig" to her face.

Mother believes the minor children are thriving under the current custody arrangement. Dakota's grades have improved. He is doing particularly well at math. She is pleased with the Reading School District and with the tutoring Dakota is receiving in the reading class. She believes that she properly cares for and disciplines the minor children. As she has been involved in the minor children's care from their birth and has taken on all maintenance and responsibilities, she believes it is inappropriate to consider any change in custody at this time.

At issue is primary physical custody. The paramount concern in a child custody proceeding is the best interests

of the child. *Costello v. Costello,* 446 Pa. Super. 371, 375, 666 A.2d 1096, 1098 (1995). A determination of what is in the best interests of a child is made on a case-by-case basis and must be premised upon consideration of all factors which legitimately have an effect upon a child's physical, intellectual, moral and spiritual well-being. *Alfred v. Braxton,* 442 Pa. Super. 381, 385, 659 A.2d 1040, 1042 (1995).

Upon review, it is apparent that both parties have substantial limitations in their ability to parent the minor children. Most of these allegations and counter-allegations, while perhaps somewhat exaggerated, appear to have occurred and occur in the presence of at least one of the minor children. It remains to be seen what long-term deleterious effects these incidents will have on the minor children's psychological health.

The altercation in Mother's car provides a good composite of the interaction of these parties. In recalling this incident, both parties testified with certainty on what the other party did wrong, but minimized their own responsibility. What likely happened was that the parties got involved in an argument while Mother was seated and ready to drive off, while Father was leaning into the car through the right rear passenger door. The argument probably became physical. Mother hit the gas petal and jerked the car forward, creating a very dangerous situation for Father and Dakota. Father, angered by Mother's actions and without regard to the position of Dakota, slammed the door on Dakota's fingers.

We are also mindful of the parties' disregard for the truth. For example, Mother had no difficulty in directing

two of her children to lie to the Muhlenberg Township officials about where the children were residing. Ironically, while Mother, for the most part was truthful with the court about this matter, the maternal grandmother, who had been sequestered prior to her testimony, attempted to cover up the incident. For Father's part, his statement regarding the car door incident, that the door accidently closed on Dakota's fingers while Mother was driving away cannot be believed. Additionally, his statement that he accidentally poked his finger in Mother's eye when he was trying to push her away stretches the imagination.

Both parties admitted intentionally disregarding a court order. In Mother's case, she was ordered to permit Father to have telephone contact with the minor children on Saturdays. She refused because Father would not permit her to have contact with the minor children on the Saturdays they were visiting with him. In addition to her disrespect of the court, this establishes that she would rather engage in a spitting contest with Father than do what is best for the minor children by permitting them access to Father by telephone. Father also did not comply with the court order when he unilaterally stopped attending anger management classes.

Unfortunately, neither party is able to maintain a separate residence without support from their families. Neither party is able to provide the minor children with a bedroom of their own.

It is Father's burden to establish that a change in custody is warranted. While he has successfully established that Mother's capacity to parent is in many ways substandard, he has failed to establish that the minor children

would be any better off with him. We cannot discern that his track record as a parent is superior to Mother's. On the other hand, if we transfer custody to Father, Dakota would have to change school districts again. The minor children will also have substantially less contact with their half-sister, Selena.

The welfare of these minor children will not be determined by the custody schedule, but rather by whether the parents will set aside their spiteful and malicious conduct toward each other and begin to work together for the minor children's sake. This will require giving the other party the benefit of the doubt, complying with the terms of the court order, and communicating. To facilitate this, the court will add some provisions to the order and will require strict compliance, with severe sanctions in the event a party is found to be in willful contempt of the court order.

We enter the following order:

## ORDER

And now, April 17, 2008, the order of September 11, 2006 is vacated. In its place, the court, after trial held, hereby orders that custody of the parties' minor children, Dakota James Steininger, born March 2, 2000, and Melissa Nicole Slimmer, born July 10, 2003, shall be as follows:

(1) The parties shall share legal custody of the minor children.

(2) Plaintiff, Jennifer Slimmer (Mother), shall have primary physical custody of the minor children.

(3) Defendant, Richard T. Steininger (Father), shall have partial physical custody of the minor children on alternate weekends from Thursday after Father concludes work until Sunday at 7 p.m., and every Tuesday from 4 p.m. until 8 p.m.

(4) The parties shall alternate the following named holidays from 10 a.m. to 7 p.m., with Father having the first holiday after the date of this order: Easter, Memorial Day, July 4th, Labor Day and Thanksgiving.

(5) Mother shall have Mother's Day each year and Father shall have Father's Day each year from 10 a.m. to 7 p.m.

(6) The parties shall share the Christmas holiday on an alternating basis, such that Mother shall have custody of the minor children on even-numbered years from Christmas Eve at 1 p.m. to Christmas Day at 1 p.m., then Father shall have the minor children from Christmas Day at 1 p.m. to December 26 at 1 p.m., with the schedule to be reversed on odd-numbered years.

(7) Each party shall be entitled to two weeks of vacation time with the minor children. The vacationing party shall provide the non-vacationing party with at least 60 days written notice of the dates and times for said vacation. If the vacation times conflict, Mother's vacation time shall take priority in odd-numbered years and Father's shall take priority in even-numbered years.

(8) The holiday and vacation schedule shall take precedence over the regular custody schedule.

(9) When Father does not have custody of the minor children, he shall be permitted to have reasonable tele-

phone call contact with the minor children every Monday, Wednesday, Friday, and Saturday during the period from 7 p.m. to 7:30 p.m. When Mother does not have custody of the minor children, she shall be permitted to have reasonable telephone call contact with the minor children on Saturdays during the period from 7 p.m. to 7:30 p.m.

(10) Neither party shall smoke in the presence of the minor children, neither shall smoke in their residence or any automobile in the presence of the minor children, and neither party shall permit third parties to smoke in their respective residences or automobiles when the minor children are present.

(11) Father shall purchase beds for the minor children for use during his custody time.

(12) When the minor children are in his custody, Father shall not have any loaded guns in his residence or automobile.

(13) If Father transports either minor child on his motorcycle, the minor child shall be wearing a motorcycle helmet approved for use by children.

(14) The parties and the minor child, Dakota, shall attend counseling with Dan Smith, Berkshire Psychiatric, 1200 Broadcasting Road, Suite 200, Reading, Pennsylvania 19610 (phone 610-375-0544). The parties shall call and schedule said counseling within 10 days of the date of this order. Mr. Smith shall engage in individual and family counseling with the parties and Dakota, as he deems appropriate.

(15) The minor child, Melissa, shall attend counseling with Emily Yego from Child & Family Services, Fourth

and Penn Streets, Reading, Pennsylvania, until Ms. Yego no longer deems it necessary, or until further order of court.

(16) Each party is required to communicate with the other party regarding the minor children's medical, dental, eye care, and educational issues. Each party shall ensure that the other party has access to all records of the minor children in a timely manner, as well as a schedule for activities.

(17) Each party shall be permitted to be present for the minor children's activities, whether it be scouts, sports or any school-related activity. If a minor child desires to become involved in an activity or sport, neither party shall withhold consent to the activity, except for good cause shown.

(18) Neither party shall permit Father's brother, Kenneth A. Steininger, to have any contact with the minor children, either directly or indirectly.

(19) The attached appendix shall be made a part of the within order.

(20) STRICT COMPLIANCE WITH THE TERMS OF THIS ORDER ARE REQUIRED.

----

## APPENDIX TO ORDER

Certain rules of conduct which generally apply to custody matters are set forth below and are binding on both parties, the breach of which could become the subject of contempt proceedings before this court, or could constitute grounds for modification of this order. If these

general rules conflict with any specific provisions of the order, the order shall prevail.

(1) In addition to the foregoing rights, both parties shall also have the following rights with respect to the children:

(A) The right to reasonable telephone contact with the children when they are in the other parent's custody.

(B) The right to be fully informed concerning the progress of the children in school and the children's medical status, including the right to obtain the necessary information directly from the children's school or medical practitioner; and

(C) The right to be informed in advance before any important decisions are made concerning the children and the opportunity to participate in those decisions.

(2) In the event of any serious illness of the children at any time, any party then having custody of the children shall immediately communicate with the other party by telephone or by any other means, informing the other party as to the nature of such illness, and during such illness, each party shall have the right to visit the children as he or she desires consistent with the proper medical care of the children.

(3) Neither party shall alienate nor permit to attempt to alienate the children from the other party. While in the presence of the children, neither parent shall make any remarks or do anything which is derogatory or uncomplimentary to the other and it shall be the duty of each parent to uphold the other parent as one the children should respect and love.

(4) Both parties shall provide each other with their addresses and telephone numbers of their residences and anytime they take a trip with the children out of the jurisdiction of Berks County in excess of three days.

(5) The parties shall not conduct arguments or heated conversation when they are together in the presence of their children.

(6) The parties shall, at all times, consider the children's best interests, and act accordingly. It is in a child's best interest to understand that he or she is trying to desperately cope with the fact of his or her parents' separation, and needs help in loving both parents, rather than interference or censure.

(7) Neither party shall question the children as to the personal lives of the other parent except insofar as necessary to insure the personal safety of the children. By this we mean that the children will not be used as spies on the other party. It is harmful to a child to be put in the role of spy.

(8) The parties should remember that they cannot teach their children proper moral conduct by indulging in improper conduct themselves. Children are quick to recognize hypocrisy, and the parent who maintains a double standard will lose the respect of his or her child.

(9) Weekend and evening visitation shall be subject to:

(A) Arrangements will be worked out beforehand between the parties without forcing the children to make choices and run the risk of parental displeasure. However, the children shall be consulted as to their schedules when appropriate.

(B) Visitation rights shall be exercised at reasonable hours and under circumstances reasonably acceptable to the other party and to the need and desire of the minor children.

(C) If a party finds himself or herself unable to keep an appointment, he or she should give immediate notice to the other party, so as to avoid subjecting the children to unnecessary apprehension and failure of expectations.

(D) The party having custody of the children should prepare them both physically and mentally for the transfer of custody to the other party and have them available at the time and place mutually agreed upon.

(E) If either party or a child has plans which conflict with a scheduled visit and wish to change such visitation, the parties should make arrangements for an adjustment acceptable to the schedules of everyone involved. Predetermined schedules are not written in stone, and both parties should be flexible for the sake of the children.

(F) If a party shows up for a visit under the influence of alcohol or drugs, the visit may be considered forfeited on those grounds alone.

(10) If either party feels the other party has violated this order, they may petition the court as set forth in Pa.R.C.P. 1915.12.